# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAIBURR SYSTEMS LLC )<br>)<br>    Plaintiff, )<br>)<br>        - against - )<br>)<br>CERES TECHNOLOGIES, INC. )<br>)<br>    Defendant )  | Civil Action No.: 1:22-cv-399 (GLS/TWD) |

## COMPLAINT

Plaintiff Kaiburr Systems LLC ("Plaintiff" or "Kaiburr"), by and through its undersigned attorneys, for its complaint against Defendant Ceres Technologies, Inc. ("Defendant" or "Ceres") hereby states as follows:

## NATURE OF THE ACTION

1. This action arises out of Defendant's breach of a written agreement with Plaintiff for goods and services pursuant to which Plaintiff has performed and is entitled to full payment.

2. In the alternative, Plaintiff has provided goods and services to Defendant in expectation of payment, which valuable good and services Defendants has accepted without full payment.

3. Plaintiff is entitled to a full recovery of all payments owed by Defendant in an amount totaling no less than $75,000, plus interest and costs.

## PARTIES

4. Plaintiff Kaiburr Systems LLC is a Massachusetts limited liability company with offices located at 2 Shaker Road, Suite D105b, Shirley, MA 01464.

5. Defendant Ceres Technologies, Inc. is a Delaware corporation with its principal place of business and operations in New York, and offices located at 5 Tower Drive, Saugerties, NY 12477.

## JURISDICTION AND VENUE

6. The Court has original subject matter jurisdiction of this action under 28 U.S.C. § 1332 (a)(1), in that this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

7. The Court has specific personal jurisdiction over Ceres because it conducts business in this judicial district, and because the unlawful conduct asserted herein occurred in, was directed at, and/or emanated in part from this judicial district.

8. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (b)(2) because Ceres maintains a place of business in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## FACTUAL BACKGROUND

9. Plaintiff Kaiburr, provides engineering solutions to its U.S.-based clients, including new product development and integrated automation solutions leveraging cloud-connected software. Plaintiff Kaiburr is a small, privately-held company with three employees.

10. Defendant Ceres is a systems integrator that provides development, engineering and manufacturing solutions, including technically-intensive design and full-build capability of industrial equipment for clients in various industries.

2

### A. Applestone and Phase 1 Agreement.

11. At all relevant times, Applestone Meat Company, LLC ("Applestone"), a New York limited liability company based in Stone Ridge, NY, was a meat processor and animal butcher shop with automated vending machines.

12. Upon information and belief, Applestone approached Ceres in 2017 to invent, design and manufacture a custom vending machine for its meat products, including a software ecosystem, to replace the solution Applestone was using at the time.

13. Upon information and belief, in or around 2017 Ceres entered into a written agreement with Applestone (the "Applestone Agreement"), by which Ceres agreed to develop and manufacture such a machine, referred to as the Automated Retail Project (the "ARS Project"). Kaiburr is not a party to the Applestone Agreement.

14. Ceres lacked the necessary experience in custom software and hardware design to develop the ARS Project, and consequently contacted Kaiburr in early 2018 to assist with certain services related to the ARS Project.

15. After initial exploratory discussions, in May 2018, Ceres contracted Kaiburr to conduct a preliminary project phase (referred to as "Phase 1") to lay out the software and hardware architecture related to the ARS Project and provide estimated development budgets and schedules (the "Phase 1 Agreement"). A true and correct copy of the Phase 1 Agreement is attached hereto as Exhibit A.

16. The Phase 1 Agreement was a fixed fee agreement, pursuant to which Kaiburr was to finalize all Phase 1 deliverables within eight weeks for a quoted fee of $39,130.

17. Kaiburr fulfilled all terms under the Phase 1 Agreement. Ceres accepted all related deliverables and paid Kaiburr the full amount of $39,130 required under the Phase 1 Agreement.

### B. Phase 2 Agreement Structured as a Time and Materials Contract.

18. Having completed Phase 1, Kaiburr and Ceres entered into an agreement, dated October 31, 2018, in connection with the second phase of the ARS Project (referred to as "Phase 2") for Kaiburr to provide services related to product development of the ARS Project, including hardware/software development and other supporting goods and services (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit B.

19. Unlike the Phase 1 Agreement, the Agreement was structured as a time and materials contract.

20. In a time and materials contract, instead of quoting a fixed price for the entire project, such contract describes the rough scope of the project along with a quote for a fixed hourly wage plus the cost of materials.

21. The Agreement reflected the parties' mutual understanding that, as a time and materials contract, Ceres would be required to pay for time spent by Kaiburr for its performed goods and services in Phase 2 at the hourly rates set out in the Agreement. Further, the Agreement did not include a maximum price for the Phase 2 project, commonly called a "not-to-exceed" clause.

22. Accordingly, the Agreement specifies that the costs and fees to be incurred are "estimated amounts", and not a fixed fee. For example, the section of the Agreement titled "Detailed Quote and Project Plan" (page 5), states that "[a] detailed estimated quote can be

4

found" in a separate document provided to Ceres, and that "[a]ctual project cost will be invoiced at the hourly rates shown in Appendix A."

23. The Agreement includes an "Appendix A" (page 10), reflecting twenty-three different hourly rates that would apply depending on the type of service provided under the Agreement.

24. The section of the Agreement titled "Invoicing" (page 7), states that "[b]illable hours (including for travel and change orders), material costs, recurring costs, and fees will be invoiced monthly (with net 30 payment terms) from the project start date." It further states that certain categories, including "non-recurring engineering", would be invoiced on a monthly basis, and that "[d]etail of actual hours and rates will be tracked similar to project cost budget spreadsheet and used monthly to calculate billable hours." This section also includes an "Estimated Amount" of (i) $859,833 for NRE (i.e., non-recurring engineering), and (ii) $1,023,421 for all costs and fees related to Phase 2.

25. The Agreement also states that the estimated quote set out in the Agreement is not comprehensive of all services to be provided, but that certain services were being excluded from such quote. Under the paragraph titled "Exclusions" (page 6), the Agreement states the following:

> "Certain engineering tasks in which the scopes are not fully defined are purposefully omitted from this document and will be quoted separately as required. Such engineering tasks include intellectual property development, equipment certification testing, and any other activity not covered under this document. Any special purpose or unplanned travel is excluded. Any additional documentation preparation outside the scope of work is also excluded."

26. In the case of termination of the Agreement by either party, the section titled "Early Termination" states that Kaiburr "…shall be paid for all materials purchased…and for all project-related hours up to and including date of project termination."

5

### C. The Purchase Order.

27. The section of the Agreement titled "Acceptance" (page 9) states that Kaiburr would commence Phase 2 services under the Agreement upon Ceres' execution of the Agreement and receipt by Kaiburr of a "purchase order for the project".

28. Kaiburr received a purchase order (No. 26385) from Ceres, dated October 31, 2018 ("Purchase Order"). A true and correct copy of the Purchase Order is attached hereto as Exhibit C.

29. The amounts included in the Purchase Order mirror the "estimated amounts" included in the section of the Agreement titled "Invoicing" (page 7), and reflect a total amount of $1,075,101.73 (the "PO Total Amount").

30. To clarify that the PO Total Amount was not due as of the date of the Purchase Order, page 2 of the Purchase Order included the following language:

> PAYMENT TERMS:
> -INITIAL PAYMENT OF $250,000 TO BEGIN WORK
> -BILLABLE HOURS (INCL. FOR TRAVEL AND CHANGE ORDERS), MATERIAL COSTS, RECURRING COSTS, AND FEES WILL BE INVOICED MONTHLY (W/ NET 30 TERMS) FROM THE PROJECT START DATE

### D. Change Orders.

31. The section of the Agreement titled "Change Order Process" (page 6) allowed Ceres to change at any time the scope of work described in the Agreement. This section also states that "[l]abor dedicated to change orders are billed at Kaiburr Systems' standard rates."

32. In or around November 2018, Ceres requested certain changes to the scope of Phase 2 services set out in the Agreement. These changes were reflected by a Change Order, with a requested date of December 10, 2018 ("Change Order No. 1"). A true and correct copy of Change Order No. 1 is attached hereto as Exhibit D. Change Order No. 1 includes a description

of the changes requested by Ceres to the original scope set out in the Agreement. It also states that "[t]he estimated cost of the change is $42,180, however it will be invoiced at actual cost and billed along with the rest of the Applestone Phase 2 Project."

33.   In or around December 2018, Ceres requested certain other changes to the scope of work set out in the Agreement. These changes were reflected by a Change Order, with a requested date of December 21, 2018 ("Change Order No. 2", together with Change Order No. 1, the "Change Orders"). A true and correct copy of Change Order No. 2 is attached hereto as Exhibit E. Change Order No. 2 includes a description of the changes requested by Ceres to the original scope set out in the Agreement. It also states that "[t]he estimated price of the change is $9,500, however it will be invoiced based on actual effort and included within the monthly invoice for the Applestone Phase 2 Project." Further, this order states that "the overall project schedule will be extended by 6 weeks as well."

34.   In addition to the Change Orders, Ceres requested a significant number of other changes to the parameters of the Phase 2 services described in the Agreement, which changes the parties understood would increase the costs and timing of the deliverables under the Agreement. The parties discussed all such changes during recurring status meetings, as well as the parties' correspondence.

35.   Ceres acknowledged to Kaiburr in writing that its requested changes "caused significant scope creep" under the Agreement, and that Ceres would communicate to Applestone that overall costs of the ARS Project would be greater than anticipated.

E. Ceres' Awareness of the Increased Project Costs.

36.   During the term of the Agreement, the parties held regular meetings to discuss relevant technical and financial issues related to the ARS Project. Most of these

meetings took place on a weekly basis, and as a result Ceres was regularly apprised of all progress being made by Kaiburr on Phase 2.

37. On September 10, 2019, Kaiburr sent Ceres an electronic monthly cost-tracking report that showed that fees and costs of approximately $850,000 had been incurred by Ceres as of August 31, 2019. Further, such report also showed that aggregate amounts for services provided by Kaiburr under the Agreement had come within twenty percent of the "estimated amount" set out in the Agreement and would exceed this amount.

38. Additionally, on September 11, 2019, Kaiburr submitted an invoice to Ceres for services performed in August 2019, in the amount of $72,112, which, together with all other invoices that Kaiburr had submitted to Ceres prior to September 2019, totaled approximately $850,000 of invoiced amounts under the Agreement as of August 31, 2019.

39. By October 24, 2019, Ceres had fully paid all monthly invoices submitted by Kaiburr through July 2019, equal to an aggregate amount of approximately $780,000 for services provided through July 31, 2019. This amount equaled approximately 77% of the "estimated amount" described in the Agreement.

40. On January 22, 2020, representatives of Ceres attended a meeting at the offices of Kaiburr for the purpose of performing a technical and financial review of Phase 2 of the ARS Project. During this meeting, Ceres chose only to focus on the technical review and left the meeting without discussing overall fees and costs invoiced by Kaiburr in 2019, as well as those projected to be invoiced in 2020.

41. On April 16, 2020, Kaiburr sent Ceres another electronic cost-tracking report, which showed that fees and costs for Phase 2 services in the approximate amount of

$1,000,000 had been incurred by Ceres as of October 31, 2019. This communication was sent to three representatives of Ceres, none of whom raised any issues or questions.

42. On May 12, 2020, Kaiburr sent Ceres another electronic cost-tracking report, which showed that fees and costs for Phase 2 services in the approximate amount of $1,470,000 had been incurred by Ceres as of March 31, 2020. Once again, Ceres failed to raise any issue upon receipt of this information.

43. On May 19, 2020, Kaiburr once again notified Ceres that actual fees and costs had exceeded the "estimated amount" set out in the Agreement.

44. Ceres did not dispute any of the amounts that had been invoiced through March 31, 2020, and did not instruct Kaiburr to cease providing services under the Agreement. In fact, Ceres informed Kaiburr than it would communicate this information to Applestone and insisted that Kaiburr should "continue to work" to complete the Phase 2 deliverables.

**F. Services and Deliverables Provided by Kaiburr to Ceres under the Agreement.**

45. Kaiburr's performing services under the Agreement continued through June 2020, at which time Ceres initially requested that Kaiburr cease its services.

46. In July 2020, however, Ceres requested that Kaiburr restart providing services under the Agreement, which Kaiburr did through January 2021.

47. As part of its performance, Kaiburr made the ARS Project deliverables available to Ceres in two separate downloadable archives, both of which Ceres accessed and downloaded. The first archive included deliverables completed through June 30, 2020. The second archive included deliverables completed from July 1, 2020 to January 31, 2021. In addition, Kaiburr fulfilled other services requested by Ceres, including multiple, separate document requests.

48. Since January 31, 2021, Kaiburr has not received any additional requests from Ceres for services to be provided under the Agreement.

### G. Invoices Submitted by Kaiburr and Outstanding Invoiced Amounts.

49. The section of the Agreement titled "Initial Payment" (page 7) required that Ceres make an initial payment of $250,000 "to secure the resources (labor & materials) prior to the project start date", which amount was paid by Ceres on November 15, 2018 (the "Deposit").

50. Kaiburr submitted an invoice to Ceres for each of the months from November 2018 to September 2019 for Phase 2 services, all of which were fully paid by Ceres. The aggregate amount paid by Ceres for these eleven invoices was $664,903 (the "Paid Invoiced Amounts").

51. The Deposit, plus the Paid Invoiced Amounts, equal a total amount paid by Ceres under the Agreement of $914,903 for services rendered by Kaiburr through September 30, 2019.

52. Thereafter, Kaiburr sent Ceres a number of invoices for Phase 2 services performed under the Agreement, to which Ceres raised no objections and made partial payments.

53. The aggregate amount invoiced by Kaiburr for Phase 2 services provided from October 1, 2019 to June 30, 2020 was $757,401, of which Ceres has paid $105,175, leaving an outstanding balance, as of June 30, 2020, in excess of $650,000.

54. Additionally, in May 2021, Kaiburr sent Ceres an invoice in the amount of $87,457 for services performed under the Agreement from July 1, 2020 to January 31, 2021, which amount remains outstanding.

55. All amounts invoiced by Kaiburr for Phase 2 services rendered under the Agreement were billed at the hourly rates set out in Appendix A of the Agreement.

56. The aggregate outstanding balance owed by Ceres under the Agreement is an amount in excess of $735,000.

## COUNT I
## BREACH OF CONTRACT

57. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

58. The Agreement, including all modifications thereto, constitutes a valid and enforceable contract between Plaintiff and Defendant.

59. Plaintiff fully performed under the Agreement by, *inter alia*, developing and transferring to Defendant the archived deliverables, which Defendant accepted.

60. Plaintiff is entitled to receive from Defendant payment for all services provided under the Agreement at the hourly rates described in Appendix A of the Agreement.

61. Defendant breached the Agreement by failing to pay Plaintiff all amounts invoiced for services provided.

62. As a result of Defendant's breach, Plaintiff has suffered economic damages in an amount to be proven at trial.

## COUNT II
## ACCOUNT STATED

63. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

64. The various invoices submitted by Plaintiff represent an account in writing for Plaintiff's fulfillment of the Agreement. The invoices show an outstanding amount of $739,684.

65. Defendant accepted and did not contest the account due of the outstanding $739,684 as a preexisting liability.

66. Despite due demands by Plaintiff, Defendant has not remitted the outstanding amount of $739,684.

67. An account has been stated.

68. Plaintiff has been damaged by Defendant in the amount of, and is entitled to recover, not less than $739,684 in invoiced amounts.

## COUNT III
## *QUANTUM MERUIT*
### (In the Alternative to Count I-II)

69. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

70. Plaintiff brings this claim in the alternative to Counts I-II.

71. Plaintiff performed its services to Defendant in good faith as per the terms of the Agreement, as modified by the parties during the course of Plaintiff's performance.

72. Plaintiff so performed with an expectation of compensation from Defendant in accordance with the hourly rates described in Appendix A of the Agreement.

73. Defendant accepted Plaintiff's performance, including, *inter alia*, the archived deliverables.

74. Plaintiff's services were of reasonable value as reflected by the amounts invoiced by Plaintiff and submitted to Defendant.

75. As a result of Defendant's inequitable conduct, Plaintiff has suffered economic damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that a judgment and order be issued providing the following relief:

    A. Awarding Plaintiff compensatory damages incurred as a result of Defendant's conduct in an amount to be determined at trial but not less than $75,000.00, together with pre-judgment interest at the maximum rate allowable by law;

    B. Awarding interest fees and reasonable costs and expenses incurred in this action; and

    C. Awarding such other relief as the Court deems just and proper.

Dated:   April 28, 2022

FRIGON MAHER & STERN LLP

By: _____
     Justin S. Stern (jstern@fmstern.com)

Justin S. Stern
Alejandro Maher

845 Third Ave.
Suite 600
New York, New York 10022
(646) 493-4683

*Attorneys for Plaintiff*
*Kaiburr Systems LLC*